MONTGOMERY ELEVATOR COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Richard A. Sabaski, Appellee).

Third District (Industrial Commission Division)    No. 3—92—0398WC

Opinion filed May 14, 1993.

John A. Hoekstra, of Katz, McAndrews, Balch, Lefstein & Fieweger, of Rock Island, for appellant.

Francis Van Hooreweghe, of Van Hooreweghe, Fackel & Thuline, of Moline, for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

The employee, Richard A. Sabaski (claimant), filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*) against Montgomery Elevator Company (employer) alleging that he sustained a work-related injury. Following a hearing, the arbitrator denied benefits and the Industrial Commission (Commission) affirmed. On judicial review, the circuit court set aside the Commission's decision, finding it to be against the manifest weight of the evidence.

The sole issue on appeal is whether the Commission's decision that the injury was not causally related to the September 27, 1987, accident was against the manifest weight of the evidence. We affirm.

Except for a layoff, claimant had worked for the employer for 32 years. At the time of the accident, claimant, a material handler, was unloading 260-pound crates of glass using a lift truck. The truck stopped suddenly, one crate started to fall, and claimant tried to "catch" it. He felt a pull in his back immediately.

Claimant reported the accident to his foreman, an incident report was made, and he was sent to a medical clinic. After being off for two days, claimant returned to work. Claimant continued to work, but after noticing numbness in his feet, he went to see Dr. Honda in May 1989. Claimant stated that he put off seeing Dr. Honda for so long because he feared another back operation. (Dr. Honda previously performed back surgery on claimant resulting from a work-related injury in 1978.) Although claimant was never completely pain-free since the 1978 incident, he continued to work regularly.

At the first examination in May 1989, Dr. Honda prescribed medication and a TENS unit and told claimant he would likely need surgery. Claimant indicated that he did not want a second surgery and continued to go to work. In June 1989, after performing and interpreting an MRI, Dr. Honda told claimant that he had a large herniated nucleus pulposus at L3-L4. Dr. Honda again recommended surgery and again claimant "elected not to have it at that time." In July 1989, Dr. Honda again saw claimant and again recommended surgery, but claimant stated "he is still working every day, does not want to miss work and does not want to have surgery." Claimant returned to see Dr. Honda in November 1989 and January 1990. In February 1990, claimant said the pain had spread to his groin and he decided to have surgery.

After the surgery, Dr. Honda reported it was "just like the MRI, showed an enlarged disc at L-3, L-4 level; and a pinched nerve, and we removed the disc." Dr. Honda stated that the numbness and pain were caused by the nerve root impinging on the disk and that it was his opinion that the ruptured disk was caused by the September 27, 1987, accident.

It was also Dr. Honda's opinion that claimant's present problems were not related to the 1978 incident. Dr. Honda had also performed the 1978 partial laminectomy but at a different level (L3). According to Dr. Honda, there was no enlarged disk at L3-L4 in 1978. Dr. Honda also stated that while claimant's present problem is numbness in his left foot and groin attributable to the enlarged disk at L3-L4, his 1978 problem involved his lower right leg which was not likely the result of a herniated disk.

At the employer's request, claimant was examined by Dr. Subbiah in June 1990. Dr. Subbiah, a neurological specialist, conducted an independent medical examination which included medical history, medical records review, and clinical examination.

According to Dr. Subbiah, claimant had pain in his right lower extremity before the 1978 surgery and after the surgery he had constant symptoms of numbness and annoying pain in the lower extremity but he continued to work. The symptoms after the 1987 incident were the same but more intense. Dr. Subbiah notes that there is no significant improvement in the low back pain or in the right-sided numbness.

It is Dr. Subbiah's opinion that the claimant's past history indicates that the claimant had an umbilical hernia, which existed for a considerable length of time. Dr. Subbiah also opined that because the claimant had identical symptoms with a pain pattern in the right

lower extremity in 1978 and in 1990, he assumed that the root that was involved was also the same. It was also noted that although the claimant returned to work and was employed for almost 10 years after his first surgery, he was never completely pain-free. The claimant told Dr. Subbiah he put up with the pain.

In summary, Dr. Subbiah states that there was a definite large herniated extradural disk at the L3-L4 level, causing significant spinal stenosis. He said that the numbness could be attributed to the claimant's alcohol consumption. Dr. Subbiah noted:

> "This obviously could not have been missed in the 1978 surgery and the patient could not have continued to live with this for the past ten years. Hence *** this was a new finding, at least in 1990. *** If the herniated disc at the L3-4 level had occurred at the time of the alleged injury (9-21-87), *** it [is] difficult to believe that this patient could have gone on with this for 21 months prior to seeing Dr. Honda."

Dr. Subbiah agrees that the claimant did have a significant spinal stenosis secondary to a herniated disk at the L3-L4 level which was most likely traumatic, but Dr. Subbiah also stated:

> "Whether this was related to the injury in September, 1987, it is difficult to tell, as I find it difficult to believe that the patient could have gone 21 months with such a significant and severe lesion prior to obtaining medical advise [sic]. However, even after the diagnosis was made, the patient went another ten months before being operated on. It is possible that the patient was concerned about surgery and hence postponed any kind of medical attention."

On appeal, the employer contends that there is substantial evidence in the record to support the Commission's finding of no causal connection. In particular, the employer points out that claimant was initially off work for only two days and that he had prior back problems with similar symptoms. The employer also places significant emphasis on the length of time claimant waited before consulting with Dr. Honda.

As the only issue before us is the manifest weight of the evidence, the often-repeated standard applies. In *Dexheimer v. Industrial Comm'n* (1990), 202 Ill. App. 3d 437, 442-43, 559 N.E.2d 1034, the court stated:

> "It is the province of the Commission to weigh and resolve conflicts in testimony, including medical testimony, and to choose among conflicting inferences therefrom. [Citations.] It is only when the decision of the Commission is without substantial

foundation in the evidence or its finding is manifestly against the weight of the evidence that the findings of the Commission should be set aside."
(See also *O'Dette v. Industrial Comm'n* (1980), 79 Ill. 2d 249, 253, 403 N.E.2d 221.) A reviewing court cannot reject or disregard permissible inferences drawn by the Commission because different or conflicting inferences may also be drawn from the same facts nor can it substitute its judgment for that of the Commission unless the Commission's findings are against the manifest weight of the evidence. (*Martin v. Industrial Comm'n* (1992), 227 Ill. App. 3d 217, 219, 591 N.E.2d 108.) It has been observed that "[t]he manifest weight of the evidence is that which is 'the clearly evident, plain and indisputable weight of the evidence.' [Citations.] In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent." (*Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276.) Finally, if the undisputed facts permit an inference either way, then the Commission alone is empowered to draw the inference, and its decision as to the weight of the evidence will not be disturbed on review. *Morgan Cab Co. v. Industrial Comm'n* (1975), 60 Ill. 2d 92, 97, 324 N.E.2d 425.

With the above standard in mind, and after considering all the evidence, we agree with the circuit court's decision that the Commission's decision was against the manifest weight of the evidence. While we are not easily moved to set aside a Commission decision on a factual question, we will not hesitate to do so where the clearly evident, plain, and indisputable weight of the evidence compels an apparent, opposite conclusion. (See *Drogos*, 100 Ill. App. 3d at 54.) For the following reasons, we judge that the opposite conclusion is clearly apparent in the case *sub judice*.

There is no dispute that claimant suffered an accident on September 27, 1987. He explained how it happened, he reported it to his supervisor, an incident report was made, and the employer sent him to a medical clinic. Further corroboration is found in that claimant told both Drs. Honda and Subbiah the same version as to how, when, and where his injury occurred. There is no evidence to the contrary.

There is also no dispute that claimant suffered a new injury subsequent to the 1978 incident. Dr. Honda described the injury as a ruptured disk at L3-L4, impinging on a nerve root resulting in numbness and pain. Dr. Subbiah agreed "that there is no question that the patient had a significant spinal stenosis secondary to a herniated disc at the L3-4 level. This most likely was traumatic." Dr. Subbiah also stated that the "large herniated extradural disc at the L3-4 level ***

was a new finding, at least in 1990." Dr. Subbiah went on to say "[t]his obviously could not have been missed in the 1978 surgery and the patient could not have continued to live with this for the past ten years."

Nor is there any dispute that a causal connection exists between the September 27, 1987, injury and the ruptured disk at L3-L4. Dr. Honda categorically stated that the September 27 injury caused the disk to rupture, the disk impinged on a nerve root, and numbness and pain resulted. Dr. Subbiah never stated that the September 27 accident did not cause the injury. He said "it is difficult to tell." While he said it is difficult to believe that claimant could go 21 months with such a significant and severe lesion prior to obtaining medical advice, he also stated:

> "However, even after this diagnosis was made, the patient went another ten months before being operated on. It is possible that the patient was concerned about surgery and hence postponed any kind of medical attention."

This in fact was claimant's testimony. He stated that he knew what it was like to go through surgery and did not want to go through it again. Given that he had never been pain-free since the 1978 surgery, claimant stated that he did not want to miss work until the pain was too much to handle. In addition to claimant's testimony, Dr. Honda stated that "claimant was a hard working guy *** and he had a huge disc. He did not want surgery, and he continued to work. This guy [has] the most highest pain tolerance I've ever seen." Dr. Subbiah also testified to this effect. He said that after another doctor told claimant that nothing could be done about the pain, claimant said he decided to put up with it and continue to work in spite of continuing symptoms.

While Dr. Subbiah notes that claimant's symptoms and pain pattern in his *right* lower extremity are identical with what Dr. Honda reported in 1978, the reason claimant consulted Dr. Honda and agreed to surgery was because of pain and numbness in his groin and *left* foot.

This case is not at all similar to *Heston v. Industrial Comm'n* (1987), 164 Ill. App. 3d 178, 517 N.E.2d 632, upon which the employer heavily relies. In *Heston*, the claimant did not offer any medical testimony. More importantly, while he claimed he was injured at work on February 28, on March 1, he helped a friend move a 150- to 200-pound desk. Nor is the present situation similar to *Martin v. Industrial Comm'n* (1982), 91 Ill. 2d 288, 437 N.E.2d 650 (also relied upon by the employer), where two medical experts disagreed as to whether there was a causal connection between claimant's fall at

work and the herniated disk for which he had surgery two years later. *Sub judice* there was not so much as a mention of any other intervening event which may have caused claimant's injury. Nor was there any conflicting medical testimony as to the cause of claimant's injury.

In view of the above, we are of the opinion that the clearly evident, plain, and indisputable weight of the evidence leads to only one conclusion. Accordingly, we affirm the order of the circuit court.

Affirmed.

McCULLOUGH, P.J., and STOUDER, WOODWARD, and RARICK, JJ., concur.