FRANK ALEXANDER, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Wil-Fred's Construction Company, Appellee).

First District (Industrial Commission Division)   No. 1—98—1628WC

Opinion filed June 30, 2000.

RARICK, J., concurring in part and dissenting in part.

Marszalek & Marszalek, of Chicago (Steven A. Globis and James J. Marszalek, of counsel), for appellant.

Nancy Jo Doyle, of Kane, Koy & Harrington, Ltd., of Chicago, for appellee.

SUPPLEMENTAL OPINION AFTER REMAND

JUSTICE RAKOWSKI delivered the opinion of the court:

In an opinion rendered on July 20, 1999, we remanded this cause to the circuit court for the limited purpose of taking additional evidence on a departing commissioner's vote in order to ascertain whether the Industrial Commission's (Commission) decision was valid pursuant to *Zeigler v. Industrial Comm'n*, 51 Ill. 2d 137 (1972).[1] Upon remand, the departing commissioner submitted an affidavit indicating she participated in oral argument and subsequent thereto she and the majority commissioner reached an agreement, which was the agreement set forth in the Commission's decision. The circuit court concluded this was sufficient. We agree. Accordingly, we address the merits of claimant's appeal and conclude that the Commission's decision finding claimant failed to prove he was permanently and totally disabled because he failed to demonstrate he fell within the "odd-lot" category is not against the manifest weight of the evidence.

## I. Validity of Commission Decision

As noted above, on remand departing Commissioner Hagan offered an affidavit in support of her vote prior to her departure. The affidavit averred that she and Commissioner Ketter reached an agreement, subsequent to oral argument and prior to her departure, on the merits of the case and that their agreement was embodied in the Commission's decision. The affidavit further established that Commissioner Hagan reviewed the Commission worksheet, which indicates her vote and upon which she had affixed her initials at the time of the decision.

We conclude that this affidavit is sufficient reliable evidence pursuant to the dictates of *Zeigler v. Industrial Comm'n*, 51 Ill. 2d 137 (1972), to show the decision of departing Commissioner Hagan. See also *Alexander v. Industrial Comm'n*, 306 Ill. App. 3d 1081 (1999). Because the affidavit is sufficient, we find the Commission's decision is valid and, therefore, address the merits of claimant's appeal.

## II. Permanent Total Disability

Claimant contends the Commission decision finding he was not permanently and totally disabled because he failed to conduct a diligent job search and, therefore, failed to demonstrate he fell within the "odd-lot" category is against the manifest weight of the evidence. Claimant was awarded temporary total disability for 130⁵/₇ weeks at $495.34 per week and permanent partial disability to the extent of 50% of the person as a whole.

---

[1] *Alexander v. Industrial Comm'n*, 306 Ill. App. 3d 1081 (1999).

Following claimant's laminectomy and discectomy, he underwent a functional capacity evaluation, which indicated he could function at light to medium work. His treating doctor released him to work with permanent restrictions, including no lifting greater than 25 pounds, no bending, no squatting, and no repetitive stair climbing. Approximately one month later, the doctor revised the restrictions, stating claimant could perform only sedentary work.

Claimant began a job search in the summer of 1993. Thereafter, employer enlisted the vocational rehabilitation services of Ellis & Associates (Ellis) to work with claimant. Ms. Carla Fallon Turner was assigned to claimant. Turner's original evaluation indicated that claimant's ability to benefit from vocational rehabilitation would be fair based on his lack of education, a high pre-injury wage, a felony conviction, and his "unrealistic expectation of wanting to earn $18.00 per hour." She recommended that claimant be placed in a machine operation position in a manufacturing setting, a job related to his ability to use tools, or a cleaning position in the service sector. However, she did not address whether such positions would fit into claimant's restrictions. She assisted claimant in putting together a resume, instructing him on how to present himself, instructing him how to fill out an application, and providing him with contacts.

According to the record, claimant made 431 contacts from February 11, 1994, to May 20, 1994, some supplied by Ellis but most he made on his own. Claimant testified he kept logs of his contacts and submitted the logs to Turner. Claimant stated that through the contacts he received three or four interviews but no job offers. He terminated his job search when he was placed with Racine Electric Company in June of 1994.

Claimant testified that most of the duties required of him at Racine Electric were in direct conflict with his doctor's restrictions. Claimant testified he worked seven hours per day, for six days over a two-week period. According to him, on five of the days he was on his feet. Claimant worked one day and then took one day off due to pain. Claimant contends he was laid off from this job.

Mr. Jesse Smith, owner of Racine Electric, contradicted claimant's testimony. He testified he was aware of claimant's restrictions and advised claimant to work at his own pace. He stated that, after approximately two weeks, claimant contacted him and told him he could no longer work. Smith denied laying claimant off.

When claimant accepted the position with Racine Electric, Ellis terminated its services. Ellis never contacted claimant after this. Accordingly, after claimant ceased working for Racine Electric, he began his own job search in which he contacted approximately 86 companies,

albeit unsuccessfully. Claimant kept a list of these companies from July or August of 1994 to February of 1995.

Turner testified on behalf of employer. She stated she met claimant on January 12, 1994, and conducted a vocational assessment. When they next met, she presented claimant with a job placement plan outlining claimant's responsibilities as well as her responsibilities in the job search process. Turner stated that although claimant obtained most job leads on his own, he did obtain some from Ellis. Turner confirmed that claimant kept a log of his contacts, which she reviewed. Turner testified claimant was advised to make 10 to 15 job contacts by telephone and two or three in person, each day. According to Turner, claimant failed to meet these quotas. Generally, he made five contacts per day. Additionally, many of the contacts claimant initially made were for jobs for which he was not qualified. Although Turner discussed this with claimant, he continued to make contacts for which he was unqualified. After reviewing claimant's log, Turner attempted to follow up on some of the contacts. She stated that two of the numbers she attempted had been disconnected even though claimant had allegedly contacted the companies only one week earlier. As a result of these inconsistencies and claimant's continued conduct of applying for jobs for which he was unqualified, Turner stated she terminated rehabilitation services on June 1, 1994.

Ms. Beverly O'Brien, Turner's assistant, also testified on behalf of employer. She too attempted to verify some of claimant's contacts. She testified she was not able to find the person or company shown on the sheets for three of the companies. Apparently she attempted to verify 38 jobs contacts. Based on her efforts to verify these contacts as well as her belief that claimant was not complying with efforts to secure employment, she opined that claimant did not fulfill Ellis' job search requirements.

Based on the foregoing, the arbitrator, while finding that claimant "clearly cannot return to his prior occupation," concluded that claimant failed to meet his burden of establishing he fell into the "odd-lot" category. First, she found there was no testimony that claimant was unfit to perform any task except those for which no stable labor market existed. In fact, claimant had been released to sedentary duty work by his treating physician. Second, he failed to show "the unavailability of work through a 'diligent but unsuccessful' attempt." She relied on the testimony of Turner and O'Brien that claimant's efforts in his job search were deficient. Not only did claimant fail to meet the recommended number of contacts per day, he continued to make contacts for positions for which he was unqualified. The arbitrator found that claimant's own log supported the position he failed to

comply with the job search recommendations. With regard to claimant's search subsequent to termination of Ellis' services, the arbitrator found that a substantial number of the contacts claimant made were the same contacts he had made while working with Ellis. In conclusion the arbitrator stated, "[t]he facts, taken as a whole demonstrate that [claimant's] job search was less than the 'diligent' job search necessary to prove that [claimant] was unemployable as a result of his age, education, skills and position." According to the arbitrator, claimant's search was of insufficient duration and quality to demonstrate work was unavailable for a person with his qualifications and background. Based on this, she concluded claimant did not fall within the "odd-lot" category and, thus, was not totally and permanently disabled. The Commission affirmed, with one commissioner dissenting.

Claimant contends that the Commission's decision finding that he failed to make reasonable and diligent efforts to find employment was against the manifest weight of the evidence. Specifically, he argues that he performed an extensive job search in which he contacted over 500 potential employers in a seven-month period,[2] many of which were made in person. Claimant contends the shear number demonstrates his conduct was reasonable and diligent. Additionally, claimant argues he learned Ellis was dissatisfied with his performance for the first time at arbitration. Further, Ellis' services were not terminated due to deficiencies in his performance but, rather, because he accepted a position with Racine Electric. Claimant discredits Turner's opinion because she based it solely on the functional capacity evaluation and did not review or consider claimant's doctor's restrictions. According to claimant, the results from the functional capacity evaluation were quite different than the description his doctor gave identifying the type of work claimant was permitted to perform. Also, claimant contends he received a job offer that he desired to accept but Ellis discouraged him from taking it because it required a starting fee. Finally, claimant contends that neither of the vocational "experts" produced by employer testified that employment was available to claimant. In fact, Turner testified that claimant was a very difficult person to place. Claimant contends that, based on his lack of education, his felony conviction, his significant restrictions, his lack of any sedentary skills, and his previous employment in labor-intensive jobs, there is no employment available for him.

■ The extent and permanency of claimant's medical disability is a

<hr>

[2]This time period is in actuality 12 months. From February of 1994 through May of 1994, claimant apparently contacted 431 potential employers, and from July or August of 1994 through February of 1995, he contacted 86.

question of fact for the Commission and we will not disturb that decision unless it is against the manifest weight of the evidence. *Boyd Brothers, Inc. v. Industrial Comm'n*, 263 Ill. App. 3d 514, 522 (1994). It is the Commission's function "to assess the credibility of witnesses, resolve conflicts in the evidence, weigh the evidence, draw reasonable inferences from the evidence, and determine the questions of fact" (*Meadows v. Industrial Comm'n*, 262 Ill. App. 3d 650, 653 (1994), citing *Paganelis v. Industrial Comm'n*, 132 Ill. 2d 468, 483 (1989)), and we will not substitute our judgment for that of the Commission simply because different inferences could be drawn from the evidence (*Meadows*, 262 Ill. App. 3d at 653).

■ It has often been held:

"[A]n employee is totally and permanently disabled *** when 'such employee is unable to make some contribution to the work force sufficient to justify the payment of wages.' [Citations.] *** A person is totally disabled when he cannot perform any services except those that are so limited in quantity, dependability or quality that there is no reasonably stable market for them. [Citations.] Conversely, if an employee is qualified for and capable of obtaining gainful employment without seriously endangering his health or life, he is not entitled to total and permanent disability compensation. [Citations.]" *Interlake, Inc. v. Industrial Comm'n*, 86 Ill. 2d 168, 176-77 (1981).

The claimant, however, need not be reduced to total disability or helplessness before the Commission may render a permanent total disability award. *Interlake, Inc.*, 86 Ill. 2d at 176. In *Valley Mould & Iron Co.*, the supreme court considered the propriety of a permanent and total disability award and stated:

"Under *A.M.T.C.* [*of Illinois, Inc. v. Industrial Comm'n*, 77 Ill. 2d 482 (1979)], if the claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances. However, once the employee has initially established that he falls in what has been termed the 'odd-lot' category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market (2 A. Larson, Workmen's Compensation sec. 57.51, at 10—164.24 (1980)), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant (2 A. Larson, Workmen's Compensation sec. 57.61, at 10—164.97 (1980))." *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47 (1981).

Again, claimant bears the burden to demonstrate that he falls within

the "odd-lot" category and if claimant fails to meet this burden, he must show he is unable to return to gainful employment. *Interlake, Inc.*, 86 Ill. 2d at 178. Claimant may meet his burden by showing: (1) "diligent but unsuccessful attempts to find work," or (2) "that, in light of plaintiff's age, experience, training and education, he is unable to perform any but the most menial tasks, for which no stable market exists." *Interlake, Inc.*, 86 Ill. 2d at 178. Whether claimant has met his burden of proof on each of these elements is a decision for the Commission. *Lanter Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 6 (1996).

■ The arbitrator found there was no evidence to support a conclusion that no stable labor market existed for someone with claimant's experience, training, education, and age. Claimant presented no evidence he could perform only the most menial of tasks. Further, there was no medical evidence offered that claimant was totally and permanently disabled. Conversely, claimant's treating doctor stated claimant could perform sedentary work. There are many types of employment that involve sedentary work and claimant presented no evidence other than his testimony that he possessed no sedentary skills to show he would be unable to perform some sort of job that utilized sedentary skills. Therefore, we agree with the Commission that claimant failed to establish that no stable labor market existed for an individual such as he.

The crux of the Commission's decision was that claimant failed to conduct a diligent job search. We first emphasize that the Commission gave credence to the testimony of Turner and O'Brien over that of claimant. While it may be true there are weaknesses in their opinions as identified by dissenting Commissioner Tansor, the Commission is presumed to have taken any weaknesses into account in judging the witnesses' credibility and weighing their testimony. In fact, we can assume such weaknesses were certainly discussed in this case prior to the commissioners reaching a decision in light of the extent and nature of Commissioner Tansor's dissent. The Commission had before it the number of contacts claimant testified he made, the number of contacts Turner and O'Brien attempted to substantiate, and the fact claimant testified he did not leave applications at all locations. The Commission simply concluded that Turner and O'Brien were more credible. To be sure, one can deduce that the Commission did not believe claimant's testimony on the number of contacts he made. Given that the Commission may have determined some of claimant's purported contacts were with nonexistent entities, it is easy to understand why it depended on other testimony. Moreover, the Commission specifically concluded claimant did not make the required number of contacts

each day even though it knew claimant stated he contacted over 500 potential places of employment. While one could conclude that 500 contacts in a 12-month period may be reasonable as Commissioner Tansor contends, the Commission did not so conclude. See *City of Green Rock v. Industrial Comm'n*, 255 Ill. App. 3d 895, 902 (1993) ("question of how long a search must continue before it becomes apparent that the possibility for realistic employment is futile is one of fact for the Commission"). Further, the Commission's decision was based primarily on the insufficient quality and insufficient duration of claimant's contacts, rather than on sheer numbers. Turner testified she discussed with claimant the fact he was making inappropriate contacts yet, following the discussion, claimant continued to make such contacts. While Commissioner Tansor and claimant argue this demonstrates there were no jobs available for claimant, the Commission did not draw such an inference. Again, where competing inferences can be drawn, we defer to the Commission unless a contrary conclusion is clearly apparent. We cannot say so here. It is evident that one can reasonably conclude from the Commission's decision that it simply did not believe claimant either with respect to the number of attempts he made to contact employers or as to the validity of the positions he sought. Although the facts might support the conclusion urged by claimant, we cannot characterize this conclusion as clearly apparent. We believe there was ample evidence to support the Commission's decision.

## CONCLUSION

For the foregoing reasons, we conclude that the Commission's decision was valid. We further conclude that the Commission's decision finding that claimant was not totally and permanently disabled because he failed to prove he fell within the "odd-lot" category is not against the manifest weight of the evidence. Similarly, we conclude that its award of permanent partial disability to the extent of 50% of the person as a whole is not against the manifest weight of the evidence.

Affirmed.

McCULLOUGH, P.J., and COLWELL and HOLDRIDGE, JJ., concur.

JUSTICE RARICK, specially concurring in part and dissenting in part:

While I agree with the majority's conclusion with respect to the

validity of the Commission's decision, I must disagree with its conclusion as to permanent and total disability. The majority relies on the "odd-lot" analysis set forth in *Lanter Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 668 N.E.2d 28 (1996). As I noted in my dissent in that case, I believe the "odd-lot" analysis therein is an inaccurate interpretation of the analytical framework set forth in *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 419 N.E.2d 1159 (1981).

In the present case, there is no medical evidence that Alexander is permanently and totally disabled. Thus, the burden remained upon him to demonstrate that he fell into the "odd-lot" category. See *Valley Mould*, 84 Ill. 2d at 546-47, 419 N.E.2d at 1163. A *prima facie* case of "odd-lot" status can be shown by a diligent but unsuccessful job search or if, because of his condition, age, training, education, and experience, he was unfit for any but the most menial tasks for which no stable market exists. See *Valley Mould*, 84 Ill. 2d at 547-48, 419 N.E.2d at 1163.

As Commissioner Tanser noted in his dissent, the arbitrator's findings, which were adopted by the Commission, demonstrate that Alexander established a *prima facie* case that he fell into the "odd-lot" category based not only upon a diligent job search, but also because his age, education, training and experience left him unfit for any but the most menial tasks. The burden then shifted to the employer to show the availability of suitable employment. The only evidence introduced by the employer to rebut Alexander's *prima facie* case, however, was the availability of work at Racine Electric. The testimony of Jesse Smith, Racine's owner, demonstrates that this job was not within Dr. Redondo's restrictions. In my view, this was wholly insufficient to rebut Alexander's *prima facie* case.

As the majority notes, the Commission's findings of fact are to be accorded great deference by a reviewing court. Complete deference is not required, however, and it is our duty to reverse a factual determination that is contrary to the manifest weight of the evidence. See *Montgomery Elevator Co. v. Industrial Comm'n*, 244 Ill. App. 3d 563, 613 N.E.2d 822 (1993). Reviewing the record, I believe that the Commission's determination that Alexander's job search was not diligent is contrary to the manifest weight of the evidence.

The arbitrator gave four reasons for finding Alexander's job search to be inadequate. The first was that Alexander failed to comply with Ellis & Associates' required number of job contacts per day. Ellis & Associates required 12 to 15 job contacts per day. The record reveals that Alexander contacted "only" seven to eight potential employers per day. Rather than making her own determination of whether this constituted a diligent effort, the arbitrator simply deferred to Ellis &

Associates' arbitrary requirements. In essence, the arbitrator simply allowed the employer's vocational expert to determine what was diligent and, in so doing, abrogated her responsibility. Moreover, I do not believe that any rational finder of fact could say that Alexander's job search was inadequate.

Other reasons given by the arbitrator for finding the job search inadequate are that "some" of the job contacts were for jobs for which Alexander was not qualified, that Ellis & Associates was unable to verify "some" of the contacts listed in his job search log, and that after vocational rehabilitation services were terminated, Alexander recontacted some of the employers he had contacted earlier. None of these can be reasonably said to demonstrate that Alexander's job search was inadequate. I find it inconceivable that any rational trier of fact could find that a job search consisting of over 430 contacts over a three-month period was not diligent.

Even in the absence of any job search, there is sufficient evidence that because of his age, training, education, and experience, Alexander was unfit for any but the most menial tasks for which no stable market exists. According to the record, Alexander was a 47-year-old cement finisher with an eighth-grade education. His entire employment history is one of unskilled manual labor. He sustained a serious work-related injury which, according to the medical evidence, left him able to do only sedentary work. His job search efforts notwithstanding, this evidence was sufficient to establish a *prima facie* case of "odd-lot" status and, again, the employer failed to adequately rebut Alexander's *prima facie* case.

In any event, I believe the overwhelming weight of the evidence demonstrates that not only did Alexander make his *prima facie* case of "odd-lot" status, which was unrebutted by the employer, he demonstrated by a preponderance of the evidence that he fell into the "odd-lot" category and was permanently and totally disabled.

For these reasons, I concur in part and dissent in part.